**In re AIR VERMONT, INC. and North Atlantic Airlines, Inc., Debtors.**

**Bankruptcy Nos. 84–00019, 84–00017.**

United States Bankruptcy Court,
D. Vermont.

May 2, 1984.

Joseph C. Palmisano, Barre, Vt., for debtor.

Mark R. Butterfield, Rutland, Vt., for Pioneer Commercial Funding Corp.

Douglas J. Wolinsky, Burlington, Vt., for Gene R. Kazlow.

Holly K. Harris, Asst. U.S. Atty., Rutland, Vt., for Internal Revenue Service and also Skip Otten of Internal Revenue Service.

Daniel Cohn, for Air Vermont Management Company.

MEMORANDUM AND ORDER ON MO-
TION OF PIONEER COMMERCIAL
FUNDING CORPORATION FOR RE-
LIEF FROM STAY

CHARLES J. MARRO, Bankruptcy
Judge.

Pioneer Commercial Funding Corp. a fi-
nancing company, based in Scarsdale, New
York did on February 2, 1984 file a Motion
for Relief from Stay so that it could pro-
ceed to realize on certain accounts receiva-
ble consisting of all billings processed
through the Airlines Clearing House, Inc.
for the account of the debtor, Air Vermont,
Inc. The debtor and Air Vermont Manage-
ment Company both objected to this motion
and, after notice, a full evidentiary hearing
was held. It is the position of the objectors
that Pioneer does not have a perfected
security interest in the accounts receivable
and for that reason is not entitled to the
proceeds of the clearing house billings.

On February 2, 1984 this court, pursuant
to a motion filed by the debtor, entered an
order ex parte requiring Air Lines Clearing
House, Inc. to pay over to the debtor the
sum of $113,984.36 which represented the
proceeds of the billings processed through
the clearing house to which the debtor was
entitled on the date of its filing of its
petition for relief under chapter 11. The ex
parte order provided that this sum was to
be held in escrow by the debtor until fur-
ther order of this court. The debtor has
received the money from Air Lines Clear-
ing House, Inc. and is holding it in accord-
ance with the Order of the court.

Pioneer claims a perfected security inter-
est in this fund and contends that it should
be paid from the amount held by the debtor
in escrow—the balance due to Pioneer from
certain loans made to the debtor in January
1984. Therefore, the basic issue for deter-
mination by this court is whether Pioneer
does in fact have a perfected security inter-
est in the clearing house proceeds held in
escrow by the debtor.

## BACKGROUND

The Debtor, Air Vermont, Inc., com-
menced business in September, 1981, as a
commuter airline operating from the Inter-
national Airport at South Burlington, Ver-
mont, to various points mostly in the
Northeast. It has suffered the growing
pains of over-expansion at a rapid rate to
the point that it started having financial
difficulty which necessitated the filing of a
Petition for Relief under Chapter 11 of the
Bankruptcy Code on January 31, 1984.

On the same day it filed an Emergency
Motion for Authority to Enter Into an In-
terim Secured Financing Agreement with
certain lenders known as VCL Partners to
incur debt with super priority over other
administrative expenses and senior to exist-
ing liens including that of the Internal Rev-
enue Service. This Motion recited that the
VCL Partners were willing to lend the
Debtor on an interim basis, pending negoti-
ations for a longer-term financing agree-
ment, immediately $100,000.00 and up to
$200,000.00 maximum on the terms and
conditions set forth in an attached Agree-
ment between the Debtor and the VCL
Partners as "Lender."

The Agreement specifically stated that
the Debtor was authorized to advance not
more than $200,000.00 and that whether
any advances shall be made and the
amount of any advances were to be in the
sole discretion of the Lender.

Notice of the hearing on this Motion was
given to members of the Creditors' Com-
mittee appointed by the Court and to the
Internal Revenue Service. Pioneer re-
ceived no notice.

At the hearing on this Motion, the Inter-
nal Revenue Service consented to the bor-
rowing by the Debtor from the VCL Part-
ners in an amount of $200,000.00 with a
super priority granted to this Lender. Af-
ter hearing, the Court signed a proposed
Order furnished by the Attorney for the
Debtor dated February 2, 1984 granting
the Debtor's Motion and providing for a
super priority to VCL Partners for funds
loaned by this partnership to the Debtor.
This Order recited in part the following:

"Such debt shall be funded initially in the
amount of $200,000.00, ..."

It also recited that:

"The provisions of the motion and the Security Agreement and Borrowing Stipulations attached thereto as Exhibit 'A' hereby are approved."

Also on Feburary 2, 1984 the court, pursuant to a motion filed by the debtor, entered an ex parte order authorizing the debtor to engage Air Vermont Management Company as a management team.

VCL Partners as of the date of hearing claimed advances to debtor in the sum of $122,644.72 and Pioneer has taken the position that, because of lack of notice, "VCL Partners" is not entitled to a super priority as against its claimed perfected security interest.

## FACTS

The debtor operates its commuter airline out of Burlington International Airport situated in the Town of South Burlington, Vermont. Its planes, both owned and leased, are based there; its fuel farms and inventory are located there; its office and ticket counter are situated there and the majority of its employees either perform or originate their services at the Airport. All its records are kept there.

Air Vermont, Inc., filed a petition for relief under chapter 11 of the Bankruptcy Code on January 31, 1984 and its schedules show total liabilities of $2,712,389.94 and assets of $2,112,725.30. Listed under Schedule A–2 as a secured creditor is Pioneer Funding, 16 Blackhawk Road, Scarsdale, NY 10583, with a claim of $100,000.00 and security of accounts receivable with a market value of $100,000.00.

Pioneer Commercial Funding Corp. is a financing company specializing in "accounts receivable" financing by taking them as security for loans to various borrowers. Sometime prior to January, 1984, Pioneer through its President, Uri Leiber, negotiated with the debtor for the financing of its accounts receivable consisting of billings processed through the Airlines Clearing House and, after making the necessary credit investigation agreed to lend the debtor up to 75% of the face value of these accounts receivable at an interest rate of 4% plus prime (11%).

Pursuant to the verbal agreement reached between Pioneer and the debtor, the Board of Directors of "Air Vermont" at a special meeting held on December 22, 1983 authorized "Air Vermont" to enter into an Accounting Financing Security Agreement with Pioneer under which Pioneer was to finance Gross Passenger Revenue, Air Freight, IATA, UATP and miscellaneous billings which were then currently processed through the Airline Clearing House, Inc. A Certification of this special meeting of the Board of Directors was executed by Gene R. Kazlow and by John E. Porter, Chairman of the Board and President, respectively, of Air Vermont, Inc. This certification was notarized and the Corporate Seal of "Air Vermont, Inc." was attached. Underscoring supplied.

On December 30, 1983, the Board of Directors of "Air Vermont" adopted a resolution under which the corporation was to borrow from time to time from Pioneer with both the President and the Chairman of the Board authorized to execute and deliver any drafts, notes and other documents and from time to time pledge, mortgage, assign subject to a security interest or lien as security, any property of the corporation or any liability of any sort of "Air Vermont" to Pioneer. A certificate of the adoption of this resolution signed by the Secretary and confirmed by the Chairman of the Board of "Air Vermont" under date of December 30, 1983 was furnished to Pioneer. Attached to this resolution was the seal of Air Vermont, Inc. Underscoring supplied.

Pursuant to these resolutions "Air Vermont" by its President, John E. Porter, did execute a continuing general security agreement granting to Pioneer a security interest in all personal property, equipment and inventory of "Air Vermont." This security agreement was dated December 30, 1983 but thereafter "Air Vermont" notified Pioneer that it wanted to limit the collateral to be pledged as security for loans from Pioneer to accounts receivable. In accord-

ance with this request Pioneer submitted to "Air Vermont" an "ACCOUNTS FINANCING SECURITY AGREEMENT" which was executed in behalf of "Air Vermont" by John E. Porter, its President and Gene R. Kazlow who was Chairman of the Board. Attached to this agreement was the corporate seal of Air Vermont, Inc. and it was accepted by Pioneer on January 6, 1984.

The agreement provided, inter alia, that "Air Vermont", as borrower, for valuable consideration, granted to Pioneer a continuing general lien and security interest in accounts receivable without limitation including those described under Exhibit "A" which reads as follows:

"All billings processed through the Airlines Clearing House, Inc. for the account of Air Vermont, including gross passenger revenues, air freights, IATA, UATP and any other miscellaneous billings."

This Agreement also contained a provision that if, at any time thereafter, Pioneer employed counsel for advice or other representation with respect to any collateral or the Agreement or any other agreement or document executed by the Borrower and delivered to Pioneer .... or to protect, collect .... take possession or liquidate any of such collateral or to attempt to enforce any security interest or lien in any collateral .... then, in such event, all of the reasonable attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, shall constitute additional obligations of Borrower, secured by the collateral, payable on demand.

Pioneer did employ a New York attorney and also Mark R. Butterfield, Esquire, of this District to enforce its security interest.

The Accounts Financing Security Agreement of January 6, 1984 superseded and replaced the Continuing General Security Agreement dated December 30, 1983.

"Air Vermont" by letter dated December 30, 1983 notified The Chase Manhattan Bank, N.A., Aerospace Division, New York, N.Y., that it had obtained loan commitments pursuant to an Accounts Financing

Security Agreement between it and Pioneer and, in consideration thereof, "Air Vermont" had assigned to Pioneer the entire Passenger Revenue, Air Freight, IATA, UATP and miscellaneous net settlement amounts also intended to secure any indebtedness then or thereafter owed by "Air Vermont" or any of its subsidiaries to Pioneer and, accordingly, did authorize Chase Manhattan to pay to Irving Trust Co. for credit to the account of Long Island Trust International Division in favor of Pioneer all such net settlement amounts received by Chase Manhattan from and after the date of the letter.

In consideration of the security interest in the accounts receivable consisting of all billings processed through the Airlines Clearing House, Inc., for the account of "Air Vermont," Pioneer instructed its bank, Long Island Trust Company, on January 11, 1984 to transfer to the Federal Reserve Bank of Boston in favor of The Howard Bank, Burlington, Vermont, the sum of $100,000.00 for further credit to Air Vermont, Inc. These funds were actually transferred to The Howard Bank in favor of Air Vermont, Inc., on January 12, 1984, and the Debtor has had the use of the money since that date. The money was to be used by the debtor for payroll and operating expenses.

On January 17, 1984 Pioneer caused a financing statement to be filed in the office of the Town Clerk of South Burlington and another financing statement to be filed in the office of the Secretary of State of the State of Vermont, both financing statements naming AIR VERMONT, INC., 1795 Williston Road, South Burlington, VT 05401 as debtor and Pioneer Commercial Funding Corp., 16 Black Hawk Rd., Scarsdale, N.Y. 10583 as secured party with the collateral described in the financing statement filed in the Office of the Secretary of State under Exhibit "A" as:

"All billings processed through the Air Clearing House for the account of Air Vermont, including gross passenger revenues, air freight, ATA, UATP, and any other miscellaneous net settlement

amounts received and payable to Air Vermont (the borrower) which are processed through the Air Clearing House, Inc."

However, the financing statement filed in the Office of the Town Clerk of South Burlington, Vermont indicated that it covered the following types (or items) of property:

"See Exhibit A."

Exhibit A was not attached to the financing statement when it was left with the filing clerk in the office of the Town Clerk of South Burlington on January 17, 1984. However, Exhibit A was actually received by the filing clerk with the financing statement and a check for $5.00 to cover the filing fee. Both the financing statement and Exhibit A were accepted for filing by the filing clerk. Under the mistaken impression that Exhibit A (on white paper) was a covering letter and not an exhibit to be stapled to the financing statement, she placed it with the check in a drawer.

This Exhibit B was intermingled with other covering letters from banks and other parties received by the filing clerk from January 16 through January 19, 1984. It remained there until it was discovered by the filing clerk after a search conducted by her in response to a subpoena served on her at the behest of the debtor's attorney for the reopened hearing on Pioneer's motion held April 6, 1984.

The papers with which Exhibit A were intermingled were under the supervision of the filing clerk and were kept by her under lock and key.

Exhibit A left with the filing clerk of the Town of South Burlington and accepted by her with the financing statement for filing contained the same description of the collateral covered as was recited in the security agreement and the financing statement filed in the office of the Secretary of State.

Pioneer incurred reasonable attorneys' fees of $6,016.00 plus costs and expenses of $386.00 for a total of $6,402.00 with respect to the prosecution of its claim as to the collateral in which it acquired a security interest.

The amount due from the debtor to Pioneer is $100,000.00 plus interest at 15% from January 12, 1984 together with attorneys' fees and expenses of $6,402.00.

## DISCUSSION

Pioneer can prevail only if it establishes that it has a perfected security interest in the accounts receivable consisting of proceeds of the billings processed through the Airlines Clearing House, Inc.

█ It is noted that the validity, nature and effect of liens are governed by the law of the state where the property is situated. In re *Meyer v. United States* 375 U.S. 233, 238, 84 S.Ct. 318, 321, 11 L.Ed.2d 293; *In re Spectra Prism Industries, Inc.*, U.S. Bkrtcy.—Appellate Panel—9th Cir.—1983, 28 B.R. 397; *In re Know-Powell-Stockton Co.*, 100 F.2d 979 (9th Cir.1939); *Porter v. Searle*, 228 F.2d 748 (10th Cir.1955).

Under the Uniform Commercial Code as adopted in this state, if the office where the assignor of accounts or contract rights keeps his records concerning them is in this state, the validity and perfection of a security interest therein and the possibility and effect of proper filing is governed by Article 9 of the UCC. Title 9A V.S.A. § 9–103(1).

Even though the security agreement between Pioneer and the Debtor recites that New York law was to govern the validity, interpretation, enforcement and effect of such agreement Pioneer followed Vermont law as to filing since it filed its financing statements in the offices of the Secretary of State and of the Clerk of the Town of South Burlington, Vermont. Likewise, it is noted that the extent of the trustee's rights, remedies and powers as a lien creditor are measured by the substantive law of the jurisdiction governing the property in question. 4 Collier 15th Ed. 544–8, § 544.- 02, citing cases. A debtor in possession has the same rights, powers and duties of a trustee. § 1107 of the Bankruptcy Code.

Under the UCC a financing statement must be filed to perfect all security interests, 9A V.S.A. § 9–302, and the places for

filing financing statements are prescribed by 9A V.S.A. § 9–401. This section provides for the proper places for filing financing statements as to various types of collateral. The proper place to file a financing statement as it pertains to accounts receivable is covered under § 9–401(1)(c) which reads as follows:

"(c) in all other cases, in the office of the Secretary of State and in addition, if the debtor has a place of business in only one town in this state, also in the office of the clerk of such town, or, if the debtor has no place of business in this state, but resides in the state, also in the office of the clerk of the town in which he resides."

This Court as early as 1968 defined a "place of business" as "one which has notoriety; a place where customers and creditors of the debtor would normally resort to or communicate with by mail or otherwise to trade with the debtor or engage in commercial transactions; a place where persons dealing with the debtor would normally look for credit information."

This definition of "place of business" was approved and it was recited in haec verba in the case of *In Re P.S. Products Corp.* (U.S. District Court, ED NY—1970), 7 UCC Rep. 411, 418; affirmed (CA 2d) 435 F.2d 781, 8 UCC Rep. 389. See also *In Re Minshell Fabrics, Ltd.* (CA 2d 1974) 419 F.2d 21, 14 UCC Rep. 227.

■ In applying the foregoing definition, it is obvious and the evidence clearly indicates that the place of business of the debtor at the time that the security agreement was executed on January 6, 1984 was in South Burlington, Vermont, and that this was its only place of business. The time when the security interest attaches is determinative. This is implicit in the pertinent statute; i.e., § 9–401. Additionally, it has been held that the time which is crucial as to the filing of the financing statement is when the security interest attaches. *In Re Kane,* (U.S. District Court E.D.Pa.1982) 1 UCC Rep.Ser. 582; *In Re Minshell Fabrics, Ltd.* (CA 2d 1974), supra.

■ Since the Town of South Burlington was the only place of business of the debtor at the time that the security interest attached it follows that, pursuant to § 9–401(1)(c) of the U.C.C., the proper places for the filing of financing statements to perfect Pioneer's security interest were in the offices of the Town Clerk of South Burlington and of the Secretary of State. Pioneer has complied with this requirement by the filing of financing statements in both offices on January 17, 1984.

The U.C.C. also requires that both the security agreement and the financing statement must contain a description of the collateral. § 9–203(1)(b) and § 9–402(1). The sufficiency of the description is prescribed by § 9–110 as "any description of personal property ... is sufficient whether or not it is specific if it reasonably identifies what is described." With respect to the description of the collateral in a financing statement the Second Circuit commented that the enactment of the U.C.C. resulted in "the scrapping of the old statutory scheme, which varied from state to state, and the substitution for it of the filing of a simple notice the purpose of which is to 'give the minimum information necessary to put any searcher on inquiry.'"

The security agreement, the financing statement filed in the office of the Secretary of State and the financing statement accepted by the Town Clerk of South Burlington for filing all contained the following description of the collateral:

"All billings processed through the Air Clearing House for the account of Air Vermont, including gross passenger revenues, air freight, ATA, UATP, and any other miscellaneous net settlement amounts received and payable to Air Vermont (the borrower) which are processed through the Air Clearing House, Inc."

As to the financing statements the foregoing description was incorporated in Exhibit A as part of such statements. It is clear that the description is adequate and it satisfies the requirements of all sections of the U.C.C. applicable to the security inter-

est of Pioneer. In view of this and with the filing of such financing statements in the proper places as required by the U.C.C. on January 17, 1984, Pioneer acquired a perfected security interest in the billings processed through the Air Clearing House now represented by the proceeds of $113,-984.36 held in escrow by the debtor subject to an order to be made by the Court.

The debtor advances the following three-pronged objection to Pioneer's right to have its perfected security interest satisfied from the escrow proceeds: (1) the perfection of Pioneer's security interest constituted a preferential transfer and does not fall within any of the statutory exceptions to voidability of such transfers; (2) Air Vermont, Inc., the debtor, did not sign the security agreement with Pioneer but that the party signing it was a non-entity by the name of Air Vermont; (3) that the security interest of Pioneer was not perfected because of the failure of Pioneer to file a proper financing statement in the office of the Town Clerk of South Burlington as required by § 9–402 of the U.C.C.; i.e., one containing the types, or describing the items of collateral. The debtor's position is untenable in all respects.

## AS TO DEBTOR'S CLAIM OF PREFERENCE AND LATE FILING

■ Subsection (b) of § 547 specifically defines a bankruptcy preference. Briefly stated, the elements of a preference under section 547(b) consist of the following: (1) a transfer of the debtor's property; (2) "to or for the benefit of a creditor"; (3) "for or on account of an antecedent debt owed by the debtor before such transfer was made"; (4) "made while the debtor was insolvent"; (5) made "on or within 90 days before the date of the filing of the petition," ........; and (6) the transfer enables the creditor to receive more than he would have received (i) if the case were a liquidation case, (ii) if the transfer had not been made, and (iii) if the claim were allowed or disallowed to the extent permitted by title 11. If any one of the elements of a preference as enumerated in section 547(b) or 547(d) is wanting, a

preference under the terms of section 547 has not been established. Thus a transfer lacking any of the foregoing elements is unassailable as a preference, except insofar as section 544(b) may come into play. The burden of proving the existence of these essential elements is upon the debtor seeking to avoid the transfer. *Collier, 15th Ed.,* pages 547–10 and 547–11. In a Chapter 11 proceeding the same burden is upon the debtor by virtue of § 1107 of the Bankruptcy Code.

■ At all times prior to the execution of the security agreement on January 6, 1984, there was no indebtedness running from the debtor to Pioneer. Assuming that the transfer of the accounts receivable was made on that date, it cannot be successfully argued the transfer was for or on account of an antecedent debt. However, the debtor tries to establish an antecedent debt through the machination of § 547(c)(3) by arguing that the security interest of Pioneer was not perfected within ten days after the security interest attached and that by virtue of § 547(e)(2), 10 day period should be counted from the date of the transfer, i.e., January 6, 1984. Since the filing of the financing statements did not occur until January 17, 1984 debtor argues that there was not perfection within 10 days and that with the payment of the $100,000.00 from Pioneer to the debtor on January 12, 1984, an antecedent debt was incurred by the debtor.

Section 547(c) defines the exception to preferences and subparagraph (3), upon which the debtor relies, provides that a trustee (a debtor by virtue of § 1107), may not avoid a transfer of a security interest in property acquired by the debtor ....

(A) to the extent such security interest secures new value that was—

(i) given at or after the signing of a security agreement that contains a description of such property as collateral;

(ii) given by or on behalf of the secured party under such agreement;

(iii) given to enable the debtor to acquire such property; and

(iv) in fact used by the debtor to acquire such property; and

(B) that is perfected before 10 days after such security interest attaches; ... (Underscoring applied)

It is quite obvious that § 547(c)(3), upon which the debtor relies, applies strictly to purchase money security interests (enabling loans). It is, therefore, inapposite and cannot be used to sustain the position of the debtor in its attempt to avoid the alleged preference. The evidence in this case is clear that the proceeds of the loan were not to be used for the purchase of property by the debtor but rather to meet its payroll and for operating expenses. This was the uncontradicted testimony which was substantiated by the objection of the debtor to the first security agreement provided by Pioneer describing the collateral as all personal property, equipment, and inventory of "Air Vermont". The debtor requested Pioneer to restrict the collateral to accounts receivable consisting of the billing processed through Airlines Clearing House, Inc., and in response to this request, Pioneer prepared an ACCOUNTS FINANCING SECURITY AGREEMENT which was substituted for the first security agreement. If the parties intended the proceeds of the loan to be used for purchasing property it is safe to assume that Pioneer would have insisted on the debtor executing the original security agreement covering personal property, equipment, and inventory of the debtor.

It is clear, therefore, that § 547(c)(3) does not apply to the present situation. It also appears that Pioneer cannot bring itself within the parameters of the exceptions to a preference under sections 547(c)(2), (4), (5), and (6). Hence, if Pioneer is to prevail it must establish that the transfer was one defined in § 547(c)(1).

Section 547(c)(1), precludes the trustee and a debtor-in-possession from avoiding a transfer in the event that such transfer (1) was intended by the parties to be a contemporaneous exchange for new value given to the debtor; and (2) was, in fact, a substantially contempaneous exchange.

That a secured loan transaction may be an exchange within the meaning of this section is clear. If the parties to a transfer intend the transfer to be "a contemporaneous exchange for new value given to the debtor," and the exchange is, in fact, "substantially contemporaneous" there is no preference. *Collier's, 15th Ed.,* § 547.-37[2], page 547–118. In *Dean v. Davis,* 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419, the Supreme Court held that there was no preference where a loan was intended by both parties to be a secured loan even though the mortgage executed in connection with the loan was not actually signed until 7 days after the loan was made. There was no preference because "[p]reference implies paying or securing a pre-existing debt of the person preferred. The mortgage was given to secured [the creditor] for a substantially contemporaneous advance." *Dean v. Davis, supra,* page 438, 37 S.Ct. page 130. Section 547(c)(1) was intended to codify *Dean v. Davis, Collier's, 15th Ed.,* page 547–118; *Countryman, Bankruptcy Preferences—Current Law and Proposed Changes,* 11 U.C.C.L.J. 95 (1978). Pioneer falls within the ambit of *Dean v. Davis* and of § 547(c)(1). It advanced the $100,000.00 to the debtor on January 12, 1984 and the security interest, although executed on January 6, 1984, did not become effective a transfer until January 17, 1984, which was the date of perfection of the interest under Code § 547(e)(2)(B). Thus the exchange was, in fact, substantially contemporaneous, as contemplated under § 547(c)(1)(A), (B). Since the evidence in this case substantiates that the parties at the outset intended the exchange to be contemporaneous the debtor-in-possession may not avoid the perfected security interest as a preference under § 547. See *In Re Arnett* (U.S. District Court, E.D.Tenn.—1982), 17 B.R. 912. In *Arnett,* Security Mutual Finance Corporation refinanced a 1978 Volkswagen and it advanced the money to the debtor by way of a check in the sum of $1,938.08 to the prior lienholder, American National Bank, on December 19, 1980, with a request that American National release its

lien on the Certificate of Title. This was mailed to Security Mutual on January 9, 1981 and its security interest was perfected on January 12, 1981. Therefore, there was a lapse of 33 days between the giving of new value and the date of transfer but the Court held that the transaction was substantially contemporaneous and said, at page 914:

"This Court is of the opinion that as a matter of law any security interest perfected in the ten day grace period will be treated as being 'in fact substantially contemporaneous,' while it will be a question of fact as to whether any transaction extending beyond those limits is 'in fact substantially contemporaneous.' When delay beyond the ten day grace period is satisfactorily explained, as in this case where it was necessary to obtain the release of American National's lien, and no risk of fraud or misrepresentation is occasioned by the delay, the statute should not prevent the courts from being able to determine that the transaction was substantially contemporaneous.

"In the present action, Judge Kelley's findings of fact amply support his conclusion that the transaction was substantially contemporaneous even though a lapse of 33 days intervened between the giving of new value and the date of transfer."

The net result is that the debtor's contention that the transfer to Pioneer was preferential and should be avoided is without merit.

### AS TO DEBTOR'S CLAIM THAT AIR VERMONT, INC., DID NOT SIGN SECURITY AGREEMENT

The debtor contends that the absence of "Inc." after the words "Air Vermont" renders the security agreement invalid. This argument is unimpressive.

It is true that the debtor is described as "Air Vermont" but the security agreement was executed by its President, John E. Porter, and attested by its Secretary with the impression of its corporate seal showing its full name, i.e., "Air Vermont, Inc." Likewise, the corporate resolutions adopted

by the debtor's Board of Directors authorizing the debtor to borrow the money from Pioneer and to enter into an Accounting Financing Security Agreement with Pioneer were impressed with the corporate seal of the debtor showing its full corporate name including "Inc." All of this clearly evinced an intent by the debtor to constitute the agreement a corporate document binding it to its terms.

■■■ It is a universal rule that in construing contracts the courts attempt to arrive at the intention of the parties as expressed in the instrument as a whole. A contract being construed is to be considered as a whole and the meaning gathered from the entire context, and not from particular words, phrases, or clauses, or from detached or isolated portions of the contract. All the words in a contract are to be considered in determining its meaning, and the entire contract in all of its parts should be read and treated together. This is so because each portion of a contract is qualified by other portions which are relevant thereto, and has no separate existence apart from them. Moreover, the entire agreement is to be considered, to determine the meaning of each part. The rule that in construing an agreement, words will be given their ordinary and popularly accepted meaning does not prevent the consideration of the entire context and subject matter in the determination of the meaning and application of specific words and _expressions_. 17 Am.Jur.2d, 658 § 258. Underscoring supplied.

■■■ The seal of the debtor impressed on the security agreement may properly be construed as an expression in the contract and it should be given full meaning.

■■■ It is a fundamental rule of contract construction that the entire contract; and each and all of its parts and provisions, must be given meaning, and force and effect, if that can consistently and reasonably be done. An interpretation which gives reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable. So

far as reasonably possible, effect will be given to all the language and to every word, expression, phrase, and clause of the agreement. No word or clause should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument. A construction will not be given to one part of a contract which will annul another part, unless such a result is fairly inescapable. 17 Am.Jur.2d, 660 § 259.

■ The Court also notes that the debtor, in notifying Chase Manhattan Bank of the first security agreement between it and Pioneer, used a letterhead printed as "Air Vermont". This would tend to indicate that it had previously done business without the use of its full corporate name and might operate as an estoppel against the denial by the debtor-in-possession that the security agreement did not bind it. On the other hand, if "Inc." was inadvertently omitted in the body of the agreement the court may supply it in order to give the instrument full meaning. 17 Am.Jur.2d 693 § 280.

It has been held that the omission of "Inc." in the corporate name of a debtor on a financing statement is considered a minor error not misleading. *In Re Central Wisconsin A.G. Supply, Inc.* (U.S. District Court W.D.Wis.) 37 U.C.C.Rep.Ser. 974. *See also In Re Excel Stores, Inc.* (C.C. A.2nd Cir.) 341 Fed. 961, 2 U.C.C.Rep.Ser. 316, in which an officer of the debtor wrote "Excel Department Stores" instead of "Excel Stores, Inc." when he filled out the security agreement. The Second Circuit held that this was a "minor error" and not "seriously misleading." The Court remarked at 2 U.C.C.Rep.Ser. 318:

"It is clear that the parties intended to execute a valid and binding contract. Cf. UCC, § 1–201(39). Nor can it be doubted that any creditor of Excel or other interested person searching the record would come to the Excel Department Store at the Shopping Center of Pawcatuck, find Machado's name and be put on notice that a lien against Excel might be outstanding and

that communication with Machado might be appropriate. This is precisely all that the Code requires. See Official Comment to UCC § 9–402."

The debtor's argument is further frustrated by the decision in *Bank of Middlebury v. Rutland and Washington R.R. Co., et al.* 1 Shaw 159 (1858) in which it was held that in sealed contracts a corporation is bound if it can establish the authority of the agent to contract in behalf of the company in the particular form, i.e., with a seal. In this case, *Rutland and Washington R.R. Co.* was a common carrier just as Air Vermont was at the time of the execution of the security agreement. In this respect the following comment of Chief Justice Redfield at page 170 is pertinent:

"[T]here follows a necessity of giving effect to the acts of such corporation [common carrier] according to the mode in which they choose to allow them to be transacted. If this were not done, it would become impossible to dispose of such contracts with any hope of reaching the truth and justice of the rights and duties of the parties involved. And this is certainly nothing of which the corporation can complain. It is merely holding them to rules of action as they see fit to adopt for their own guidance and the transaction of their business."

■ The Court recognizes that *Bank of Middlebury v. Rutland and Washington R.R. Co.,* supra, was decided over a century and quarter ago but the words of wisdom and common sense of Chief Justice Redfield still obtain even in modern jurisprudence. In the face of this the debtor's position has no substance and creates, at the most, a technical objection to the validity of the security agreement. The debtor having received the fruits of the contract, i.e., the sum of $100,000.00, this Court, as one of equity, is constrained not to permit this same debtor-in-possession under Chapter 11 to receive a windfall at the expense of the other party, Pioneer, who contracted in good faith and carried out all of its obligations under the agreement.

## AS TO DEBTOR'S CLAIM OF INSUFFICIENT DESCRIPTION IN FINANCING STATEMENT FOR PERFECTION OF SECURITY INTEREST

The debtor contends that the requirement as to description of collateral in the financing statement was not met for the reason that Exhibit A was not attached to the financing statement left with the Town Clerk of South Burlington for filing.

The U.C.C. requires such a description of personal property as reasonably identifies what is described. Section 9–110. In addition, the formal requirements of a valid financing statement include a statement indicating the types, or describing the items, of collateral. 9A V.S.A. § 9–402(1).

It cannot be successfully argued that the description in Exhibit A of "all billings processed through the Airlines Clearing House, Inc. ___" is not an adequate description. But the debtor insists that since Exhibit A was not attached to the financing statement when left with the Town Clerk, there was no proper filing of the Financing Statement.

■ The undisputed testimony of the filing clerk of South Burlington, which the Court deems most convincing, clearly establishes that the financing statement together with Exhibit A and a check for $5.00 were received by her and accepted for filing. Through oversight and a human error she assumed that Exhibit A was a covering letter for the financing statement and the check. As a result she failed to staple Exhibit A to the financing statement but instead placed it together with the check with other covering letters in a drawer. Her failure to attach Exhibit A to the financing statement is not fatal to perfection. The U.C.C. is very specific as to what constitutes filing. § 9–403(1) provides that presentation for filing of a financing statement and tender of the filing fee <u>or acceptance of the statement</u> by the filing officer constitutes filing under this article. Underscoring supplied.

■ The wording of this statute is given full force and effect by case law. See *In Re Braun* (CDCD Me.Ref.1969), 6 UCC Rep. 1031; *In Re Royal Electrotype Corp.* (CA 3rd, 1973), 485 F 2d 394, 13 U.C.C.Rep. 183; *In Re Mutual Board & Packaging Corp.* (CA 2d, 1965), 342 F 2d 294, 2 U.C.C. Rep. 451; *In Re May Lee Industries, Inc.* (DCSCNY–1974), 380 F Supp. 1, 15 UCC Rep. 528, affirmed an opinion below 501 F 2d 1407 (CA2d, 1974), 15 UCC Rep. 532.

■ The secured party does not bear the risk that the filing officer will not properly perform his duties. Under Section 9–403(1) the secured party has complied with the filing requirements when he presents the financing statement for filing and the filing fee has been tendered or the statement accepted by the filing officer. See Uniform Laws Comments after § 9–407; *In Re Braun, In Re Mutual Board & Packaging Corp.; In Re May Lee Industries, Inc.,* supra.

Pioneer complied with both alternatives of the filing requirements. It presented the financing statement and tendered the filing fee and these with Exhibit A were accepted by the filing officer. Exhibit A clearly identified the personal property intended as collateral. The financing statement was also filed properly in the office of the Secretary of State. As a result the security interest of Pioneer was perfected on January 17, 1984 on which date it became a lienholder superior to the rights of the debtor whose status as a judicial lienholder was not established, pursuant to Section 544 of the Bankruptcy Code, until the filing of the petition for relief on January 31, 1984.

The debtor's position on all three grounds advanced by it has no merit.

## ATTORNEYS' FEES

■ Under the American system, "the law imposes on a party the duty to pay his own fees and expenses in vindicating his own personal interest." *United States v. Larchwood Gardens, Inc.,* 420 F.2d 531, 534 (3rd Cir.1970). However, § 506(b) of the Code does permit the allowance of reasonable fees, costs, or charges provided

under the agreement which gives rise to a claim if the secured creditor is oversecured.

Pioneer is, in fact, oversecured and the security agreement does provide for the payment by the debtor to Pioneer, if it employs counsel with respect to the agreement, of all reasonable attorney's fees arising from their services, together with costs and charges relating thereto ____.

The attorneys for Pioneer have submitted an application for compensation of $6,016.00 and expenses of $386.00 for a total of $6,402.00. There has been no objection by the debtor and the Court considers these reasonable and they are allowed. In addition, Pioneer is requesting reimbursement for expenses of $885.00 for travel and lodging of its principal officers in attending the hearing on its motion for relief from stay, together with telephone, mail and miscellaneous expense. The Court does not consider that they relate to the legal services rendered by Pioneer's attorneys but rather as incurred by a party litigant. In addition, charges are clearly exorbitant. For these reasons they are disallowed.

### ORDER

Now, therefore, upon the foregoing,

IT IS ORDERED:

1. The motion to terminate the stay is GRANTED.

2. The debtor shall pay from the sum of $113,984.36 held in escrow per Order of February 2, 1984 to Pioneer Commercial Funding Corp., the sum of $100,000.00 plus 15% interest from January 12, 1984 together with reimbursement of $6,402.00 for attorneys' fees and expenses.

3. Any balance remaining shall be retained in escrow by the debtor subject to further order of this Court.